UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDWIN ROJAS, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 7283 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| X MOTORSPORT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Edwin Rojas brought this suit against X Motorsport, Inc., an automobile dealership, alleging violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, and state law. Doc. 1. After X Motorsport moved for summary judgment, Doc. 14, Rojas sought and was granted time to take additional discovery, Docs. 18, 21, voluntarily dismissed his ECOA and state law claims, Docs. 34-35, and cross-moved for partial summary judgment as to liability on the TILA claim, Doc. 41. During briefing on the cross-motions, X Motorsport moved to strike several pieces of evidence that Rojas cited. Doc. 45. X Motorsport's summary judgment motion is granted, Rojas's motion for partial summary judgment is denied, and X Motorsport's motion to strike is denied as moot.

**Background**

When considering Rojas's summary judgment motion, the facts are considered in the light most favorable to X Motorsport, and when considering X Motorsport's motion, the facts are considered in the light most favorable to Rojas. *See Cogswell v. CitiFinancial Mortg. Co.*, 624 F.3d 395, 398 (7th Cir. 2010) ("When the district court decides cross-motions for summary judgment … we construe all facts and inferences therefrom in favor of the party against whom

1

the motion under consideration is made.") (internal quotation marks omitted).  Because granting X Motorsport's summary judgment motion disposes of the case, the following relates the facts in the light most favorable to Rojas.  *See Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014).  On summary judgment, the court must assume the truth of those facts, but does not vouch for them.  *See ibid.*

On January 14, 2016, Rojas agreed to purchase a used Volkswagen sedan from X Motorsport for $29,142.67.  Doc. 15 at ¶¶ 6-7; Doc. 52 at ¶¶ 6-7.  The Standard Buyers Order ("SBO") that Rojas signed that day called for a down payment of $9,183; he paid $7,000 in cash and signed two promissory notes, one for $1,500 due the next day and the other for $683 due two weeks later.  Doc. 15 at ¶ 8; Doc. 52 at ¶ 8.  (Rojas did not make good on either note.  Doc. 15 at ¶ 34; Doc. 52 at ¶ 34.)  To cover the remaining $19,959.67, and at the same time he signed the SBO, Rojas signed a retail installment sale contract ("RISC"), which required him to make 72 monthly payments of $460.34 payable to X Motorsport or its assignee.  Doc. 15 at ¶ 9; Doc. 52 at ¶ 9; Doc. 54 at ¶¶ 7, 10; Doc. 54-2 at 7.  The RISC identified X Motorsport as a "Seller-Creditor."  Doc. 54 at ¶ 8.

The SBO contained the following clause, which conveyed that the SBO would not remain binding if X Motorsport was unable to assign the RISC to a third-party financer:

> If purchaser is buying the Vehicle in a credit sale transaction with Dealer evidenced by a signed [RISC], this Agreement is binding when the [RISC] is signed, but will not remain binding if a third party finance source does not agree to purchase the [RISC] executed by Purchaser and Dealer based on this Agreement.

Doc. 15 at ¶ 11; Doc. 52 at ¶ 11.  The SBO also contained this clause:

> If for any reason you and we do not complete the Vehicle sale and purchase, financing is not obtained, or this Agreement is declared void, this section applies.  You will return the Vehicle to us.  You will pay us on demand all reasonable charges and expenses for any damage to the Vehicle.

Doc. 15 at ¶ 12; Doc. 52 at ¶ 12.  And the SBO contained a merger clause: "[T]his Agreement … comprises, with any [RISC], the complete and exclusive statement of the terms of the agreement relating to the subject matters covered by this Agreement."  Doc. 54 at ¶ 6; Doc. 54-2 at 2.

In addition to the SBO, the RISC, and the two promissory notes, Rojas signed a "Sold As-Is Rider," agreeing that the sale was final and that the vehicle could not be returned for any reason, and an "Immediate Delivery Agreement," which allowed him to take possession of the vehicle on the spot while specifying the circumstances under which X Motorsport could repossess it—one of which was X Motorsport's failure to assign the RISC to a third party.  Doc. 15 at ¶¶ 13-15; Doc. 52 at ¶¶ 13-15; Doc. 54 at ¶¶ 11-12, 16.

Rojas left with the car, but on his way home it began making worrisome noises.  Doc. 15 at ¶ 16; Doc. 52 at ¶ 16.  He reported the problem to X Motorsport, which told him to bring the car back.  Doc. 15 at ¶ 17; Doc. 52 at ¶ 17.  Over the next few days, Rojas and X Motorsport's finance manager, Zaia Rasho, tried unsuccessfully to arrange a time for Rojas to bring in the car.  Doc. 15 at ¶ 18; Doc. 52 at ¶ 18.  Rasho then asked if Rojas whether he would prefer to "just … give the vehicle back," and Rojas responded, "Yeah, let me just get my money back.  Let's rip up this contract and I'll give you your car back … ."  Doc. 15 at ¶¶ 18-19; Doc. 52 at ¶¶ 18-19.  X Motorsport agreed to allow Rojas to return the car and made arrangements for him to do so on January 23.  Doc. 15 at ¶¶ 20-21; Doc. 52 at ¶¶ 20-21.

The January 23 appointment did not go smoothly.  Rojas did not have the car with him, and he balked at receiving his refund as a check and not in cash.  Doc. 15 at ¶¶ 26-27, 30-31; Doc. 52 at ¶¶ 26-27, 30-31.  Confusion ensued.  Doc. 15 at ¶¶ 32-33; Doc. 52 at ¶¶ 32-33.  Rojas eventually returned the vehicle to X Motorsport on February 13, 2016, and got back his down payment a few days later.  Doc. 15 at ¶¶ 35-36; Doc. 52 at ¶¶ 35-36.

The foregoing is all undisputed. The parties dispute only whether X Motorsport secured third-party financing for Rojas's purchase (in other words, whether X Motorsport assigned the RISC to a third party)—Rojas says no, and X Motorsport says yes—and, if not, whether X Motorsport told Rojas about the rejection of his financing—Rojas says yes, and X Motorsport says no. Doc. 15 at ¶¶ 10, 29; Doc. 52 at ¶¶ 10, 29; Doc. 54 at ¶¶ 25, 28; Doc. 57. X Motorsport has moved to strike certain evidence adduced by Rojas that is relevant to those factual disputes. Doc. 45. The court will assume that the challenged evidence may properly be considered and that the facts are what Rojas contends they are, because even ceding those points to Rojas, X Motorsport is entitled to summary judgment.

**Discussion**

"TILA was intended to ensure that consumers are given 'meaningful disclosure of credit terms' and to protect consumers from unfair credit practices." *Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011) (quoting 15 U.S.C. § 1601(a)). Toward that end, TILA requires lenders to disclose certain information to prospective debtor-consumers prior to entering into a financing arrangement, such as "the number, amount, and due dates or period of payments" necessary to complete repayment, *Hamm v. Ameriquest Mortg. Co.*, 506 F.3d 525, 528 (7th Cir. 2007) (quoting 15 U.S.C. § 1638)(a)(6)) (brackets and emphasis omitted), "any finance charges" owed under the transaction, *Rivera v. Grossinger Autoplex, Inc.*, 274 F.3d 1118, 1121 (7th Cir. 2001) (citing 15 U.S.C. § 1638(a)(3)), and the "amount financed"—*i.e.*, the "amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(a)(2)(A). "[T]he disclosures must reflect the terms of the legal obligation of the parties and must be given before the consumer becomes contractually obligated on a credit transaction." *Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765, 767 (7th Cir. 2000) (citation and internal quotation marks omitted).

4

The parties agree that the RISC disclosed all the information that TILA demands, but Rojas contends that the disclosures were illusory—not "meaningful," as TILA demands—because the parties' contract was "conditioned" on X Motorsport's assignment of the RISC to a third party financer. Doc. 41 at 10-11. According to Rojas, because the RISC would be void if it were not assigned, X Motorsport's disclosures did not meaningfully reflect the credit that was actually available to him. *Id*. at 11. Rojas contends that TILA forbids this sort of "bait and switch." *Ibid*.

Rojas's argument has a fatal flaw: the Seventh Circuit rejected it in *Janikowski*. The plaintiff in *Janikowski* went to purchase a car and signed a "Vehicle Purchase Order" and a "Retail Installment Contract" that disclosed a 5.9% interest rate. 210 F.3d at 766. The dealership could not, however, guarantee that it would be able to find a lender willing to finance the purchase at that rate, and the purchase order stated that "[i]f financing cannot be obtained within 5 business days … according to the proposals in the retail installment contract … , either Seller or Purchaser may cancel the Agreement." *Ibid*. The plaintiff drove the car home, only to learn the next day that the dealership had not secured financing at the 5.9% rate. *Ibid*. She returned and signed a new set of contracts, this time agreeing to an 11.9% rate. *Id*. at 766-67.

The plaintiff later sued, contending that the dealership's disclosure of the 5.9% rate was false, and thus a TILA violation, because it was conditioned on the dealer finding a lender willing to finance the purchase. *Id*. at 767. The Seventh Circuit disagreed, explaining:

> Th[e] disclosure [of the 5.9% rate] reflected the terms of [the plaintiff's] legal obligations, as required by [TILA and its implementing regulations]. She was not legally obligated to purchase the [car] at any rate other than 5.9%. The next day, after [the plaintiff] learned that she had been denied financing at 5.9%, the [original] contract was canceled. She then entered into a new contract, which disclosed an 11.9% APR. Therefore, even though [the plaintiff] did not eventually obtain financing at 5.9%, [the defendant] *did not*

5

> *violate TILA because it accurately disclosed her legal obligations under the two contracts.*

*Ibid*. (citation omitted) (emphasis added). In other words, the Seventh Circuit concluded, TILA requires only "truthful disclosures of a consumer's legal obligations," *id*. at 769, and the presence in the contract of a condition subsequent that might later nullify those obligations does not make those disclosures untrue or improper under TILA.

As in *Janikowski*, X Motorsport truthfully informed Rojas of his legal obligations under the contract, notwithstanding the fact (as the court assumes for present purposes) that X Motorsport later failed to find a third party financer willing to be assigned the RISC on the terms to which X Motorsport and Rojas had agreed. The SBO disclosed the third party financing condition to Rojas, explaining that "this Agreement is binding when the [RISC] is signed, but will not remain binding if a third party finance source does not agree to purchase the [RISC]." Doc. 15 at ¶ 11; Doc. 52 at ¶ 11. It also truthfully disclosed the financial terms that would obligate him if the financing condition were met. Even assuming that X Motorsport's failure to assign the RISC was the exclusive reason for the contract's cancellation—rather than the mechanical problems Rojas experienced and his desire for a refund—those disclosures make this case indistinguishable from *Janikowski*, in which the first contract disclosing the lower rate was canceled because of the dealership's failure to secure financing. Both there and here, the terms of the deal and the possibility that it might be voided were disclosed.

Rojas identifies four grounds for distinguishing *Janikowski*, all unpersuasive. He principally contends that the merger clause in Rojas's SBO somehow changes the equation, by "exclud[ing] any other document that purport[s] to contradict" the disclosures in the RISC. Doc. 51 at 2. It is unclear whether the SBO's merger clause makes this case different than *Janikowski*; that case makes no mention, one way or the other, of whether either contract there contained a

6

merger clause. *Id*. at 4 (conceding that "the *Janikowski* opinion does not indicate whether any of the contractual documents contained a merger clause"). But even if there were no merger clause in *Janikowski*, its absence there would be an immaterial distinction. Just as the Seventh Circuit read the purchase order and the retail installment contract in *Janikowski* as part of a single, overarching agreement between the parties, so, too, the SBO and the RISC here form a single agreement. The SBO's merger clause incorporates the RISC by reference. Doc. 54-2 at 2 (stating that "this Agreement … comprises, *with any retail installment sale contract*, the complete and exclusive statement of the terms of the agreement") (emphasis added). And regardless, "Illinois law mandates that when," as here, "different instruments are executed together as part of one transaction or agreement, they are to be read together and construed as constituting but a single instrument," with or without a merger clause. *IFC Credit Corp. v. Burton Indus., Inc.*, 536 F.3d 610, 614 (7th Cir. 2008). So the SBO's merger clause simply acts to re-create the circumstances in *Janikowski*: an agreement conditioned on future financing. The merger clause means that the SBO language conditioning the deal on assignment and the financial terms disclosed in the RISC must be read together, and when read together they are indistinguishable from the agreement that the Seventh Circuit held satisfied TILA in *Janikowski*.

Rojas's other asserted distinctions fare no better. The fact that the plaintiff in *Janikowski* subsequently entered a second contract with different terms, Doc. 51 at 1, is immaterial; the key point is that the first *Janikowski* contract, like Rojas's contract, was conditional but truthful. Rojas's assertion that the *Janikowski* parties "believed that contract consummation occurred, if at all, at time of assignment," rather than at signing, *id*. at 2, is unsupported by *Janikowski* and, in any event, irrelevant; no matter when the parties' contract was consummated, the TILA disclosures would still have been made beforehand, as required. And *Janikowski*'s rejection of

7

the plaintiff's alternative argument that the disclosures needed to be labeled "estimates" to be truthful, *ibid.*, has no bearing on this case.

Rojas cites out-of-circuit cases that arguably support his position, *see Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060 (11th Cir. 2004); *Salvagne v. Fairfield Ford, Inc.*, 794 F. Supp. 2d 827 (S.D. Ohio 2010); *Patton v. Jeff Wyler Eastgate, Inc.*, 608 F. Supp. 2d 907 (S.D. Ohio 2007), and at the motion hearing, he mounted a spirited argument that *Janikowski* was wrongly decided and the product of "groupthink." From a district court's perspective, all that need be said is that *Janikowski* is binding and that it squarely forecloses Rojas's claim. *See Williams v. Amazon.com, Inc.*, 312 F.R.D. 497, 500 (N.D. Ill. 2015) ("[T]his court is obligated to follow Seventh Circuit precedent … ."). If Rojas would like a court to change Seventh Circuit law, he will have to pursue that course on appeal.

Because the court grants X Motorsport's summary judgment motion, it follows that Rojas's cross-motion for partial summary judgment fails. And because X Motorsport can prevail even if the evidence it moved to strike is considered, the motion to strike is denied as moot.

## Conclusion

For the foregoing reasons, X Motorsport's summary judgment motion is granted, Rojas's motion for partial summary judgment is denied, and X Motorsport's motion to strike is denied as moot. Judgment will be entered in favor of X Motorsport and against Rojas.

June 2, 2017

_____
United States District Judge